IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| YETI COOLERS, LLC<br><br>      Plaintiff,<br><br>  v.<br><br>U.S. CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection; and the UNITED STATES OF AMERICA<br><br>      Defendants. | Court No. 26-cv-00368 |

## COMPLAINT

1. Plaintiff, YETI Coolers, LLC ("Plaintiff"), is a U.S.-based importer of merchandise subject to the challenged duties in this complaint. Like challenges raised by others, Plaintiff brings this action to (a) challenge the legality of the tariffs imposed since February 2025 pursuant to the International Emergency Economic Powers Act ("IEEPA"), (b) prevent Defendants from collecting duties from Plaintiff pursuant to such tariffs actions, and (c) obtain refunds of duties Plaintiff already paid pursuant to such tariff actions.

2. Since February 2025, the President of the United States has signed a series of executive orders invoking IEEPA as the basis for imposing broad new tariffs ("IEEPA duties") on goods entering the United States from nearly every country, including countries from which Plaintiff sources its imports. As an importer of record, Plaintiff is responsible for paying IEEPA duties on goods it imports into the United States.

3. IEEPA does not authorize these tariffs. This Court and the Court of Appeals for the Federal Circuit ("Federal Circuit") have already so held. *See V.O.S. Selections, Inc. v.*

*United States*, 772 F. Supp. 3d. 1350, 1365-67 (Ct. Int'l Trade 2025), *aff'd in part, vacated in part, remanded sub nom. V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, 222 L. Ed. 2d 1231 (Sept. 9, 2025). The U.S. District Court for the District of Columbia has also found that the same tariffs were not authorized by the IEEPA statute. *See Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, 222 L. Ed. 2d. 1231 (Sept. 9, 2025).

4. Consistent with the decision of this Court and the Federal Circuit in *V.O.S. Selections*, Plaintiff seeks an order that the IEEPA duties imposed by Defendants under these executive orders are unlawful, preventing Defendants from collecting such duties in the future, and granting a refund of the IEEPA duties Plaintiff has already paid.

5. *V.O.S. Selections* and *Learning Resources* are under consideration by the Supreme Court. Briefing is complete, and the Supreme Court held oral argument on November 5, 2025. This separate action is necessary, however, because even if the IEEPA duties and underlying executive orders are held unlawful by the Supreme Court, importers that have paid or will pay IEEPA duties, including Plaintiff, are not guaranteed a refund for those unlawfully collected tariffs in the absence of their own judgment and judicial relief.

6. Further, immediate judicial relief is warranted because the bulk of the entries for which Plaintiff has paid tariffs imposed under authority of IEEPA will begin to liquidate in the near term. Although Plaintiff believes that relief – including a refund of IEEPA duties paid – is available after liquidation (and this Court recently so held in another case), Plaintiff seeks relief from the impending final liquidations to ensure that its right to a complete refund is not jeopardized in the event Plaintiff and this Court are wrong about the availability of post-liquidation relief.

7. Accordingly, Plaintiff seeks (i) a declaration that the IEEPA duties are unlawful; (ii) an injunction preventing Defendants from imposing further duties on it under the executive orders challenged in this lawsuit; and (iii) an order requiring Defendants to refund all IEEPA duties Plaintiff has already paid to the United States as a result of the executive orders challenged in this lawsuit, as well as those it will continue to pay, with interest.

## PARTIES

8. Plaintiff, YETI Coolers, LLC, is a U.S. company, incorporated in Delaware (importer of record number 27-441600300).

9. Defendant United States Customs and Border Protection ("CBP") is a component agency of the U.S. Department of Homeland Security headquartered in Washington, D.C. CBP is responsible for border security and collecting tariffs or duties and taxes on goods imported into the United States.

10. Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity.

11. Defendant United States of America received the disputed tariffs and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

12. Defendants are referred to collectively in this complaint as "CBP".

## JURISDICTION

13. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i) and 28 U.S.C. § 2631(i). *See V.O.S. Selections*, 149 F.4th at 1327-30; *V.O.S. Selections*, 772 F. Supp. at 1365-67.

14. The Court has the same powers at law, in equity, and as conferred by statute as a United States District Court. 28 U.S.C. § 1585. In a civil action under 28 U.S.C. § 1581, the

Court can enter a money judgment against the United States and can order any other appropriate civil relief, including declaratory judgments, injunctions, orders of remand, and writs of mandamus or prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

15.  Plaintiff has standing to bring this lawsuit because it is the importer of record for goods imported into the United States from countries subject to the unlawful IEEPA duties as implemented and collected by CBP. As a result of the executive orders challenged by this lawsuit, Plaintiff has paid IEEPA duties to the United States and thus has suffered injury caused by those orders. Plaintiff also faces the potential for imminent and irreparable harm because the majority of entries for which it paid IEEPA duties are anticipated to liquidate as early as January 16, 2026.

## BACKGROUND

**I.  President Trump Orders a Series of Tariffs, Invoking IEEPA**

    **A.  The IEEPA Duties**

16.  On February 1, 2025, President Trump issued three executive orders imposing tariffs on products of Canada, Mexico, and China. Each executive order invoked IEEPA as the statutory basis for authorizing the tariffs. For each set of tariffs, the President claimed that the tariffs were justified under IEEPA because of a purported national emergency related to risks arising from alleged trafficking of illegal drugs into the United States and/or risks arising from illegal immigration.

17.  Executive Order 14194, 90 Fed. Reg. 9,117, *Imposing Duties To Address the Situation at Our Southern Border* ("Mexico Tariff Order"),[1] imposed an additional 25 percent

---

[1] Exec. Order No. 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 1, 2025).

tariff on imports from Mexico, with certain exceptions. The order justified the use of emergency powers based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." *Id.*

18. Executive Order 14193, 90 Fed. Reg. 9,113, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border* ("Canada Tariff Order"),[2] similarly declared an emergency related to opioid trafficking and imposed 10 percent and 25 percent tariffs on imports from Canada, with certain exceptions.

19. Finally, Executive Order 14195, 90 Fed. Reg. 9,121, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China* ("China Tariff Order"),[3] also declared an emergency because of opioid trafficking, asserting that "the sustained influx of synthetic opioids" constituted a national emergency and that "[m]any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce." The China Tariff Order imposed an additional 10 percent *ad valorem* tariff on products of China, with certain exceptions and on top of existing duties.[4] Collectively, the Mexico Tariff Order, the Canada Tariff Order, and the China Tariff Order are referred to herein as the "Trafficking Tariff Orders," and the tariffs thereunder are referred

---

[2] Exec. Order No. 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 1, 2025).

[3] Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025).

[4] Four days later, on February 5, 2025, the President issued another order, Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* ("February 5 Amendment"), which amended the treatment of *de minimis* articles but did not impact the tariff rates for other articles. Exec. Order No. 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,277 (Feb. 5, 2025).

herein as the "Trafficking Tariffs."

20. On March 3, 2025, the President amended the China Tariff Order through Executive Order 14228, 90 Fed. Reg. 11,463, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China* ("March 3 Amendment").[5] The March 3 Amendment raised the tariff rate on products of China from 10 percent to 20 percent and justified this increase by claiming that "the PRC has not taken adequate steps to alleviate the illicit drug crisis."

21. On April 2, 2025, citing trade deficits with U.S. trading partners as a separate national emergency, President Trump issued Executive Order 14257, 90 Fed. Reg. 15,041 ("Reciprocal Tariff Order"), *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*.[6] The Reciprocal Tariff Order imposed a 10 percent baseline tariff on nearly all imports to the United States, with certain exceptions, effective April 5, and additional "reciprocal" tariffs on 56 countries and the member states of the European Union, effective April 9.[7] These higher country-specific tariffs range from 11 percent to 50 percent. *Id*.

22. The Reciprocal Tariff Order asserts that "U.S. trading partners' economic policies . . . suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits." *See* Reciprocal Tariff Order.

23. On April 8, 2025, the President responded to retaliatory tariffs from China by raising the reciprocal tariff rate on products of China from 34 to 84 percent. Exec. Order No.

---

[5] Exec. Order No. 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11,463 (Mar. 7, 2025).

[6] Exec. Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025).

[7] *Id*. at Annex I.

14259, 90 Fed. Reg. 15,509, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*.[8]

24. The next day, the President signed Executive Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*,[9] which suspended the higher country-specific "reciprocal" tariffs on all countries, except China, for 90 days. The same order raised the "reciprocal" tariff rate imposed on China-origin goods from 84 to 125 percent. *Id*. Meanwhile, the 20 percent Trafficking Tariff on products of China remained in place, such that many imports from China faced a combined tariff rate of 145 percent under IEEPA.

25. In implementing these executive orders, the Defendants directed modifications to the Harmonized Tariff Schedule of the United States ("HTSUS") so that merchandise subject to the new duties would be entered under new tariff codes.

26. On April 14, 2025, several companies filed an action in this Court challenging the legality of these tariff orders. *See* Complaint, *V.O.S. Selections*, *et al. v. Donald J. Trump*, *et al.*, No. 25-cv-00066 (Ct. Int'l Trade Apr. 14, 2025), ECF No. 2). As discussed below, this Court held the tariff orders were unlawful, and the Federal Circuit, sitting *en banc*, affirmed.

27. In the months since the *V.O.S. Selections* complaint was filed, the President has invoked IEEPA to issue additional executive orders imposing new tariffs and modifying others. As explained below, IEEPA does not authorize the President to impose tariffs. By this Complaint, however, Plaintiff challenges only those orders the Federal Circuit has already held to

---

[8] Exec. Order No. 14259, *Amendment to Reciprocal Tariffs and Updated Duties As Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15,509 (Apr. 8, 2025).

[9] Exec. Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading-Partner Retaliation and Alignment*, 90 Fed. Reg. 15,625 (Apr. 9, 2025).

be unlawful ("Challenged Tariff Orders"[10]) and the duties paid pursuant to the Challenged Tariff Orders ("Challenged Duties").

### B.    Implementation of the Challenged Tariff Orders by Defendant CBP

28.     CBP is charged with the assessment and collection of duties, including the Challenged Duties assessed pursuant to the Challenged Tariff Orders. *See* 19 U.S.C. §§ 1500, 1502.

29.     In 1988, Congress enacted the Omnibus Trade and Competitiveness Act of 1988, which adopted the HTSUS. Pub. L. No. 100–418, 102 Stat. 1107. CBP classifies merchandise imported into the United States consistent with the HTSUS, which sets out the tariff rates and statistical categories using a series of nested chapters, headings, and subheadings. 19 U.S.C. § 1202. The primary headings of the HTSUS describe broad categories of merchandise, while its subheadings provide a particularized division of the goods within each category. *Id.*

30.     CBP's regulations govern the classification and appraisement of merchandise, consistent with the HTSUS. 19 C.F.R. § 152.11 ("Merchandise shall be classified in accordance with the Harmonized Tariff Schedule of the United States (19 U.S.C. § 1202) as interpreted by administrative and judicial rulings.").

31.     The United States International Trade Commission ("USITC") publishes and

---

[10] The Challenged Tariff Orders are the following executive orders and all amendments thereto:
- Executive Order No. 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9,113 (Feb. 1, 2025);
- Executive Order No. 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9,117 (Feb. 1. 2025);
- Executive Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9,121 (Feb. 1, 2025);
- Executive Order No. 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 2, 2025); and
- Executive Order No. 14266, *Modifying Reciprocal Tariff Rates To Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg 15,625 (Apr. 9, 2025).

maintains the HTSUS consistent with presidential orders. 19 U.S.C. §§ 1202, 3005, 3006; *see also Michael Simon Design, Inc. v. United States*, 33 C.I.T. 1003, 1010, 637 F. Supp. 2d 1218 (2009) ("The authority to modify the HTSUS lies with the President"); *Maple Leaf Marketing, Inc. v. United States*, 528 F. Supp. 3d 1365, 1378–79 (Ct. Int'l Trade 2021).

32. When goods enter the United States, CBP is responsible for assessing and collecting any tariffs on those goods according to the rates established by the HTSUS, after confirming the HTSUS classification of the goods. 19 U.S.C. §§ 1202, 1500, 1502.

### C. Liquidation

33. CBP regulations define liquidation as "the final computation or ascertainment of duties on entries for consumption or drawback entries." 19 C.F.R. § 159.1.

34. Typically, when goods enter (*i.e.*, are imported into) the United States, the importer of record pays an estimated duty based on the declared value of the goods, the country of origin, and HTSUS classification. *See* 9 U.S.C. § 1484. CBP then reviews the entry declaration and may inspect the goods.

35. After review, CBP finalizes the classification, value, duty rate, and total duties owed. *See* 19 U.S.C. § 1500.

36. Once the final amount of duty is determined, CBP "liquidates" the entry and notifies the importer of record as to whether they owe more money or are entitled to a refund. *See* 19 U.S.C. § 1504(b).

37. Unless extended, liquidation must happen within one year. *See* 19 U.S.C. § 1504(a). As a matter of practice, CBP typically liquidates duties 314 days after the date of entry of the goods and will usually post a notice of liquidation on its website.

38. CBP has discretion to extend the deadline for liquidation for up to one year

pursuant to an importer's request and a showing of good cause. *See* 19 U.S.C. § 1504(b)(2); 19 C.F.R. § 159.12(a)(1)(ii).

39. This Court possesses the equitable authority to suspend liquidation. *See, e.g.*, *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365-66 (Ct. Int'l Trade 2021).

40. If the importer disagrees with CBP's liquidation decision and if that decision is protestable, the importer must challenge that liquidation within 180 days by filing a protest requesting reliquidation. *See* 19 U.S.C. § 1514.[11]

41. Specifically, an importer may protest "any clerical error, mistake of fact, or other inadvertence . . . in any entry, liquidation, or reliquidation, and, decisions of the Customs Service." *Id.* However, where CBP acted ministerially, without discretion, such as by applying a duty rate without discretion, the liquidation generally cannot be protested. *See United States v. U.S. Shoe Corp.*, 523 U.S. 360, 365-66 (1998); *Rimco Inc. v. United States*, 98 F.4th 1046, 1053 (Fed. Cir. 2024).

42. Both this Court and the Federal Circuit have expressed some uncertainty about a court's ability to order a refund of duties once entries are liquidated, even if a tariff is later found to be unlawful. *See Target Corp. v. United States*, 134 F.4th 1307, 1316 (Fed. Cir. 2025); *In re Section 301 Cases*, 524 F. Supp. 3d at 1365-66. More recently, this Court indicated that post-liquidation relief is possible where the constitutionality of the underlying tariff is in question. *See* Opinion and Order, *AGS Co. Auto. Sols., et al v. United States* ("*AGS*"), No. 25-00255 (Ct. Int'l Trade Dec. 15, 2025), ECF No. 29. Plaintiff contends that *AGS* is correct but recognizes that *AGS* is not a final or binding decision.

---

[11] CBP can also voluntarily reliquidate within 90 days of the liquidation. *See* 19 U.S.C. § 1501.

## II.  IEEPA Does Not Authorize Tariffs

43.	The Challenged Tariff Orders cite IEEPA, 50 U.S.C. § 1701 *et seq*., the National Emergencies Act, 50 U.S.C. § 1601 *et seq*., section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and 3 U.S.C. § 301 for authority to impose the subject tariffs. None of these statutes authorizes the President to impose any tariffs. Indeed, the Federal Circuit expressly held that IEEPA does not authorize the duties imposed through the Challenged Tariff Orders.

44.	IEEPA grants the President certain emergency powers, but they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b). Those powers include the ability to "investigate, . . . regulate, . . . or prohibit . . . importation or exportation of . . . any property in which any foreign country or a national thereof has any interest." 50 U.S.C. § 1702(a)(1)(A)–(B). The text of IEEPA does not use the word "tariff," "duty," or any term of equivalent meaning. Nor does it authorize the President to impose duties, raise duty rates, create country-specific schedules, or modify the HTSUS.

45.	IEEPA was first enacted in 1977 and has been amended several times, but it has never been amended to authorize the imposition of tariffs, even though Congress has enacted numerous other tariff statutes where it expressly granted that power to the President under specified conditions. Furthermore, IEEPA has never been used by any other President to impose tariffs.

### A. The U.S. Constitution Vests in Congress—not the President—the Power to Impose Tariffs.

46. The U.S. Constitution places tariff authority squarely within Congress's purview. Article I provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States," and further specifies that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises," and to "regulate Commerce with foreign nations." U.S. CONST. art. I, §§ 1, 8.

47. Tariffs fall within the Taxing and Commerce Clauses of the U.S. Constitution.

48. To the extent that Congress delegates any part of the powers vested in it by the Constitution to the President, it must do so with clear and intelligible guidance. *See FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025).

49. IEEPA contains no such intelligible principle permitting the President to impose tariffs. The statute provides authority to regulate or control property and financial transactions, but does not authorize duties that can rise to 145 percent or apply to nearly all imports.

50. Further, if IEEPA was read as authorizing tariffs it would be unconstitutional under the nondelegation doctrine for lack of any intelligible principle.

51. The Supreme Court has repeatedly emphasized that Congress must "speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 716 (2022) (cleaned up) (*quoting Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 324 (2014)). When Congress has not clearly spoken, courts are directed to find that matters of vast "economic and political significance" are beyond the power of the President. *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023).

52. By any objective measure, the Challenged Tariff Orders are "of vast economic

and political significance," and Congress has not delegated its tariff authority to the President through clear and intelligible guidance. Therefore, because IEEPA does not authorize the President to impose tariffs, the Challenged Tariff Orders cannot stand, and the Defendants are not authorized to implement and collect the Challenged Duties.

          **B.    Courts Have Held that IEEPA Does Not Authorize the Challenged Tariffs**

53. On May 28, 2025, a three-judge panel of this Court granted summary judgment to the plaintiffs in *V.O.S. Selections* and permanently enjoined the government from enforcing the Challenged Duties at issue in that case. That decision was appealed to the Court of Appeals for the Federal Circuit. Sitting *en banc*, the Federal Circuit on August 29, 2025, affirmed this Court's decision that the Challenged Tariff Orders (and resulting Challenged Duties) are unlawful. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, 222 L. Ed. 2d 1231 (Sept. 9, 2025).

54. In a different lawsuit filed by a separate group of importers, the U.S. District Court for the District of Columbia held that IEEPA does not authorize tariffs of any sort. *See Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, 222 L. Ed. 2d 1231 (Sept. 9, 2025). That decision was appealed to the Court of Appeals for the D.C. Circuit, but before the D.C. Circuit held argument, the United States Supreme Court granted *certiorari* in both *V.O.S. Selections* and *Learning Resources*. The cases were consolidated and briefed, on an expedited schedule, before the Supreme Court. The Supreme Court heard oral argument on November 5, 2025.

**III.    Plaintiff Paid Challenged Duties**

55. As of the date of this Complaint, Plaintiff has paid IEEPA duties imposed by the Challenged Tariff Orders (again, "Challenged Duties").

56. In addition to other applicable HTSUS codes, Plaintiff's imports subject to the Challenged Tariff Orders entered the United States under newly created HTSUS codes within Chapter 99.

57. Plaintiff has paid the Challenged Duties on a continuous basis.

58. The bulk of entries for which Plaintiff has paid the Challenged Duties are scheduled to begin liquidation in the near term.

59. Based on Plaintiff's knowledge and belief, CBP has advised importers that it will not extend liquidation for entries subject to IEEPA tariffs.

60. Without judicial relief, these entries will liquidate imminently, potentially extinguishing Plaintiff's ability to obtain refunds, even if the Supreme Court affirms the Federal Circuit's ruling in *V.O.S. Selections*.

## STATEMENT OF CLAIMS

### COUNT I
### THE CHALLENGED TARIFF ORDERS ARE *ULTRA VIRES* UNDER *V.O.S. SELECTIONS*

61. Plaintiff incorporates by reference paragraphs 1-60 above.

62. This Court has already held in *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d. 1350, 1383 (Ct. Int'l Trade 2025), *aff'd in part, vacated in part, remanded sub nom. V.O.S. Selections Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, 222 L. Ed. 2d 1231 (Sept. 9, 2025), that the President exceeded his authority under IEEPA when he imposed tariffs on imported goods.

63. As this Court explained in *V.O.S. Selections*, IEEPA authorizes the President only to "investigate, regulate, or prohibit" certain categories of foreign transactions in times of national emergency; it does not authorize the imposition of tariffs or duties on imported goods.

*Id*. at 1361. Nor does it transfer tariff-imposing power from Congress to the President.

64. The Federal Circuit affirmed this Court's ruling, holding that Congress did not clearly delegate to the President the authority to impose tariffs under IEEPA and that reading IEEPA to permit such authority would raise grave constitutional concerns, including under the major questions and non-delegation doctrines.

65. The Challenged Tariff Orders in this Complaint are the same as those struck down in *V.O.S. Selections*. They rely exclusively on IEEPA as the basis for imposing the Challenged Duties and revising the HTSUS.

66. For the same reasons articulated by this Court and the Federal Circuit in *V.O.S. Selections*, the Challenged Tariff Orders exceed the President's statutory authority and are therefore unlawful and void as to Plaintiff.

67. Plaintiff respectfully requests that this Court declare that the Challenged Tariff Orders (and resulting Challenged Duties) are unlawful as to Plaintiff and enjoin CBP from further collecting Challenged Duties from Plaintiff. The Court should also order CBP to refund all Challenged Duties collected from Plaintiff since their imposition, with interest as provided by law.

## COUNT II
## ALTERNATIVELY, THE CHALLENGED ORDERS ARE UNCONSTITUTIONAL

68. Plaintiff incorporates by reference paragraphs 1-67 above.

69. In the alternative, if and to the extent this Court were to conclude that IEEPA authorizes tariffs, the Challenged Tariff Orders are nevertheless invalid under the U.S. Constitution because such a reading of IEEPA would constitute an impermissible delegation of legislative authority.

70. The United States Constitution vests in Congress exclusively the power to "lay

and collect . . . Duties." U.S. CONST. art. I, § 8, cl. 1.

71. Under well-established separation-of-powers principles and binding precedent of the U.S. Supreme Court, Congress cannot delegate its power to the President unless it provides an intelligible principle that directs and meaningfully constrains the President's exercise of that power. IEEPA does not do that.

72. IEEPA contains no such intelligible principle with respect to tariffs. Nothing in IEEPA provides any standard, limit, or guidance under which the President may impose duties, revise duty rates, or modify tariff schedules. As a result, interpreting IEEPA to authorize the Challenged Duties would amount to an unconstitutional transfer of legislative power to the executive branch.

73. Therefore, in the alternative to the relief sought under Count I, Plaintiff respectfully seeks a declaration that the Challenged Tariff Orders are unconstitutional as to Plaintiff, an injunction preventing Defendants from enforcing the Challenged Tariff Orders as to Plaintiff, and an order requiring refunds of all Challenged Duties Defendants collected from Plaintiff, with interest as provided by law.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court:

(a) hold that the Challenged Tariff Orders are *ultra vires* and void *ab initio* because the President lacks the authority under IEEPA to impose tariffs;

(b) hold, in the alternative, that the Challenged Tariff Orders are unconstitutional;

(c) declare that the Challenged Tariff Orders are unlawful and void with respect to Plaintiff;

(d) declare, in the alternative, that the Challenged Tariff Orders are unconstitutional;

(e)     enjoin Defendants from imposing and enforcing against Plaintiff any tariffs set out in the HTSUS that are based on the Challenged Tariff Orders;

(f)     enjoin Defendants from liquidating Plaintiff's entries upon which any Challenged Duties were assessed but have not been refunded;

(g)     order the United States to refund to Plaintiff the Challenged Duties collected on Plaintiff's entries, with interest as provided by law;

(h)     award Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action; and

(i)     grant such further relief as this Court deems proper.

Dated: January 8, 2026                Respectfully submitted,

                                                 */s/ Richard A. Mojica*
Richard A. Mojica
Adam Feinberg
Brittany Huamani
MILLER & CHEVALIER CHARTERD
900 Sixteenth Street NW
Washington, D.C. 20006
Telephone: (202) 626-5800
Fax: (202) 626-5801
Email: rmojica@milchev.com
Email: afeinberg@milchev.com
Email: bhuamani@milchev.com

*Counsel for Plaintiff*